UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                                      :
EQUAL EMPLOYMENT OPPORTUNITY                          :
COMMISSION,                                           :
                                                      :
                              Plaintiff,              :
                                                      :
              v.                                      :
                                                      :
MAVIS DISCOUNT TIRE, INC., *et al.*,                  :
                                                      :
                              Defendants.             :
                                                      :
------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 11, 2015

12 Civ. 741 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Plaintiff Equal Employment Opportunity Commission (the "EEOC"), initiated this action in January 2012, alleging that Defendants Mavis Discount Tire, Inc., d/b/a Mavis Tire Supply Corp., Mavis Tire NY, Inc., and Cole Muffler, Inc. (collectively, "Defendants" or "Mavis") engaged in a pattern or practice of sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17. The EEOC alleges that Defendants discriminated against the charging party, Nicole Haywood, and other similarly qualified female applicants during the 2008 to 2012 time period, in favor of hiring less qualified men for positions in their branch stores. The EEOC also alleges that Defendants failed to comply with the record-keeping requirements of Section 709(c) of Title VII, 42 U.S.C. § 2000e-8(c). The EEOC has now moved for summary judgment on its pattern-or-practice and record-keeping claims, and separately has moved to bifurcate the trial in this action in the event summary judgment is not granted. For the reasons set forth below, the

EEOC's motion for summary judgment is denied in its entirety, and the EEOC's motion for a bifurcated trial is granted in part and denied in part.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    Mavis's Business

Mavis is a family-owned, independent tire dealer.  (Def. 56.1 ¶¶ 207, 211). In addition to tire sales, Mavis store locations also offer automotive parts and services including brakes, alignments, suspension, shocks, struts, oil changes, battery replacement, and exhaust work.  (*Id.* at ¶ 212).

In 1987, Mavis was comprised of approximately 11 store locations; it has grown significantly since then.  (Def. 56.1 ¶ 213).  Most notably, in 2008, Mavis acquired approximately 50 stores from Cole Muffler, Inc.  (*Id.* at ¶ 214).[2]  Today, Mavis operates more than 140 store locations in New York, Connecticut, Massachusetts, and Pennsylvania.  (*Id.*).

Stephen Andre, currently the Vice President of Operations for Mavis, first joined the Company in 1987.  (Def. 56.1 ¶ 213).  Andre was ultimately responsible for all hires at Mavis during the relevant time period, having either made or approved every offer of employment.  (Pl. 56.1 ¶ 159).  But although

---

[1]    The facts stated herein are drawn from the parties' submissions in connection with the instant motion, including the EEOC's 56.1 Statement ("Pl. 56.1" (Dkt. #96)), and Defendants' responses thereto ("Def. 56.1 Response" (Dkt. #102-03)); Defendants' 56.1 Counterstatement ("Def. 56.1" (Dkt. #103)), and the EEOC's responses thereto (Pl. 56.1 Response" (Dkt. #107)).  References to individual deposition transcripts will be referred to as "[Name] Dep."  For convenience, the EEOC's opening brief will be referred to as "Pl. Br." (Dkt. #95); Defendants' opposition brief as "Def. Opp." (Dkt. #104); and the EEOC's reply brief as "Pl. Reply" (Dkt. #106).

[2]    Defendants note that not a single female employee was employed in any of the 50 Cole stores acquired by Mavis.  (Def. 56.1 ¶ 215).

Andre retained the final authority for hiring, he did not make Mavis's personnel decisions alone.  In 2008, in response to company growth, Mavis created the position of Regional Training Manager ("RTM").  (*Id.* at ¶ 217).  RTMs are responsible for overseeing between eight and fifteen stores that fall within their assigned regions.  (*Id.* at ¶ 218; Pl. 56.1 Response ¶ 218).  For each store within a particular region, an RTM controls the payroll, trains the store managers, ensures profitability, performs human resources functions, and recruits qualified applicants.  (*Id.* at ¶ 219).

Every application submitted at a store location is given to the appropriate RTM for review.  (Def. 56.1 ¶ 233).  If the RTM determines there is a need for a particular position, the RTM determines whether to interview any of the applicants.  (*Id.* at ¶ 235).  If the decision is made to interview, the RTM checks the applicant's references and confirms that the information provided in the application is accurate.  (*Id.* at ¶ 237).  If, after conducting the interview, checking the references, and confirming the accuracy of the information set forth in the application, the RTM decides to offer the position to the applicant, the RTM makes a recommendation to Andre to hire the applicant.  (*Id.* at ¶ 238; Andre 30(b)(6) Dep. 223).[3]  Based on his review of the information presented by the RTM as well as Mavis's budget, Andre decides whether to hire

---

[3]    Andre was deposed in his individual capacity, and as Mavis's 30(b)(6) witness.  *See* Fed. R. Civ. P. 30(b)(6) ("[A] party may name as the deponent a ... private corporation .... The named organization must then designate one or more ... persons who consent to testify on its behalf.").  References to Andre's 30(b)(6) deposition will be designated accordingly.

the applicant.  (Def. 56.1 ¶ 239).[4]  The Mavis personnel involved in hiring

testified that they do not actively seek to hire a certain group of applicants;

rather, Mavis seeks to hire the most qualified applicants.  (*Id.* at ¶ 242).

There are four available positions at each Mavis store location: (i) Store

Manager; (ii) Assistant Manager; (ii) Mechanic; and (iv) Tire Installer/Alignment

Technician ("Technician").  (Def. 56.1 ¶ 216).[5]  From 2008 to 2012, Mavis hired

80 Store Managers, 655 Mechanics, and 1,688 Technicians.  None of these

individuals was female.  (Pl. 56.1 ¶¶ 46-51).  During this same period of time,

Mavis hired 288 Assistant Managers, only one of whom was female.  (*Id.*).  After

the EEOC filed its lawsuit in January 2012, Mavis hired its first female Store

Manager (*id.* at ¶ 47), and its second female Assistant Manager (*id.* at ¶ 49).

### 2.   Unsuccessful Female Applicants

#### a.   Nicole Haywood

Nicole Haywood unsuccessfully applied on multiple occasions to work at

Mavis.  (Pl. 56.1 ¶ 112; Def. 56.1 Response ¶ 112).  At the time of her initial

application in 2008, Haywood had approximately 15 years of experience

working at Sears Automotive as a customer service representative; for

approximately nine of those years, she performed managerial duties, including

---

[4]  For applications submitted at store locations, Andre considers only those applicants who have been recommended for hire by the RTM (Def. 56.1 ¶ 240).  For applications submitted by email, Andre makes the initial determination as to whether the applicant is worth pursuing.  (Andre 30(b)(6) Dep. 84).  He then forwards the application to RTMs who may need to fill positions in the applicant's area of expertise.  (*See* Def. 56.1 Response ¶ 188).

[5]  Tire Installer and Alignment Technician are technically separate positions at Mavis, but, for the purposes of the parties' statistical analyses and the instant motion for summary judgment, they are treated as one.

scheduling technicians, delegating their work, handling customer complaints, and receiving shipments.  (Pl. 56.1 ¶¶ 113-14).  In 2008, Mavis hired three male Sears Automotive employees.  (*See id.* at ¶¶ 115-22).  Significantly, all three had been trained by Haywood while at Sears Automotive.  (*See* Haywood Dep. 33, 81, 132-33).  After she learned of these hires, Haywood attempted to renew her application to Mavis at various stores and through various channels.  (*See* Pl. 56.1 ¶¶ 116-22).

Eventually, Haywood was interviewed by Andre for 15 to 30 minutes.  (Pl. 56.1 ¶¶ 123-24; Def. 56.1 Response ¶ 124).  According to Andre, the interview went poorly.  (*See generally* Andre Dep. 73-76).  He testified that Haywood arrived 15 minutes late for the interview; displayed a poor attitude; and disparaged her then-current employer.  (Def. 56.1 Response ¶ 124).  Following the interview, Andre contacted Jim Dubois, a Store Manager for Mavis who had previously supervised Haywood at Sears Automotive, to ask whether Dubois would recommend offering Haywood a position with Mavis.  (*Id.*).  Based on both his observations during the interview and Dubois's comments, Andre decided not to extend an offer of employment to Haywood.  (*Id.*).

### b. Krystal Murnane

Krystal Murnane, who at the time of her 2009 application to Mavis had approximately six years' experience performing basic maintenance on cars, was told by Mavis employees at its Bayshore, New York location that she would not be hired by Mavis because she was a woman.  (*See* Murnane Dep. 79 (testifying that a Mavis employee said: "[D]on't get your hopes up, you're a chic[k].  These

guys are old school."); *id.* at 80 (testifying that a Mavis employee told her, "a girl can't do a guy's job"); *id.* ("[T]he manager [at Mavis] told me that all the guys would stare at me.")).  Murnane applied to work at Mavis on three or four occasions between 2009 and 2010.  (Pl. 56.1 ¶ 132).  Mavis did not hire here and, indeed, never contacted her.  (*Id.*).

### c.    Pyper Braly

Pyper Braly, a tire technician with two years' experience changing tires in a pit crew during NASCAR races and another nine months' experience as a mechanic, applied to work at Mavis's Huntington Station, New York store, but when she handed in her application, the male manager who took the application was rude and dismissive.  (Pl. 56.1 ¶ 125).  Mavis never called Braly in for an interview and did not hire Braly.  (*Id.* at ¶ 126).

### d.    Amber Luby

Amber Luby, who had worked for roughly six months as a tire technician with Goodyear, applied to work for Mavis at the East Greenbush, New York store in October 2009.  (Pl. 56.1 ¶ 127).  When Luby returned to Mavis to follow up on her initial application, she was told that Mavis did not have a record of her application.  (*Id.* at ¶ 128).  She completed a second application, but never heard back from Mavis and was not hired.  (*Id.*).  In the summer of 2012, Luby applied a third time to Mavis, but again was not hired.  (*Id.* at ¶ 130).

### e.    Julie Griffin

Julie Griffin worked as a Head Service Advisor at a Honda dealership for four years when she first applied to work at Mavis.  (Pl. 56.1 ¶ 133).  She was

interviewed by a Mavis Store Manager, who told her that he wanted to hire her, but needed approval from his RTM. (*Id.* at ¶ 134). Griffin eventually learned that the RTM decided to hire the Store Manager's friend for the position. (Def. 56.1 Response ¶ 135).

### f.   Ashley Jackson

Ashley Jackson, who, at the time of her application to Mavis had 17 months of automotive experience, applied twice to work for Mavis. (Pl. 56.1 ¶ 136). Jackson called Mavis after each of her two job applications to follow up on her applications. She testified that she was "brushed off," and told that Mavis was not hiring. (*See id.* at ¶ 137; Def. 56.1 Response ¶ 137).

### g.   Barbara Evans

Barbara Evans, who at the time of her application to Mavis had managed a repair shop for over six years, submitted an online application to work at Mavis. (Pl. 56.1 ¶ 139). Evans contacted Mavis to follow up on her online application and was told that if she submitted an application online, Mavis would have received it. Although she provided Mavis with her contact information, she never heard anything back either confirming receipt of her application or advising her about its status. (*Id.* at ¶ 140).

### h.   May Menawi

May Menawi applied for employment with Mavis in 2008 to be an Assistant Manager at its Tarrytown, New York location. (Pl. 56.1 ¶ 142). At that time, she worked as a service writer at Sears Automotive in White Plains. (*Id.* at ¶ 143). Days after Menawi completed an application at the

7

Tarrytown location, the Store Manager interviewed Menawi for approximately 30 to 60 minutes.  (Def. 56.1 Response ¶ 143).  Following the interview, Menawi was not hired.  (*Id.*).

### i.    Miranda Cooper and Adeline Van Dyke

In similar fashion, Miranda Cooper and Adeline Van Dyke applied to Mavis but were not hired.  (Pl. 56.1 ¶¶ 144-48).  At the time Cooper applied, she had a Board of Cooperative Educational Services ("BOCES") certification for general automotive repairing, and a work history at various automotive shops.  (*Id.* at ¶¶ 144-45).  Van Dyke had automotive training and knowledge and had performed supervisory responsibilities at her husband's auto body shop.  (*Id.* at ¶¶ 149-50).

In total, there are 42 female applicants whose "credentials on paper" make them well-qualified candidates, according to the EEOC, for Mavis employment.  (Pl. 56.1 ¶ 91).  The EEOC has also identified a number of male applicants Mavis hired during the 2008 to 2012 time period who had equal or less experience than the unsuccessful female applicants.  (*See id.* at ¶¶ 151-58).

### 3.    Mavis's Record-Keeping

The EEOC has also expressed concerns about Mavis's record-keeping practices.  By way of background, Mavis contends that it had an application retention process in place during 2008 through 2012.  (Def. 56.1 ¶¶ 220-24).  Store Managers were told to collect the applications received in-person at store locations in a manila envelope; RTMs were responsible for collecting those

applications from each store and providing them to Human Resources on a weekly basis. (Pl. 56.1 Response ¶ 220). This application retention process was not memorialized or communicated to store management in writing. (*Id.*). Instead, RTMs conveyed this policy to Store Managers verbally. (*Id.*; Def. 56.1 ¶ 229). Applications that were submitted via email were forwarded to Andre and retained in electronic form indefinitely. (*See* Def. 56.1 ¶ 226-29).

Each of the unsuccessful female applicants identified by the EEOC during the 2008 to 2012 time period testified that she submitted application forms for employment, but Defendants have been unable to locate all of these applications. (*See* Pl. 56.1 ¶¶ 164-76). The EEOC contends that the inability to locate these applications, along with testimony from Mavis employees, demonstrates that Defendants' record-keeping policy was not effective at retaining all applications. (*See id.* at ¶¶ 177-200). Defendants counter that, although their employees "could not testify under oath that every application submitted to [their] 140+ locations were kept and delivered to Human Resources, [they] did not cherry pick applications and throw them away." (*E.g.*, Def. 56.1 Response ¶ 187).

### 4. The Experts' Statistical Analyses

The EEOC's expert economist, Dr. Marc Bendick, Ph.D., issued an initial report (the "Bendick Report" (Dkt. #97-1)) on October 25, 2013. (Pl. 56.1 ¶ 5). In relevant part, Dr. Bendick opined that:

- Because of Mavis's incomplete retention of applications and the possible chilling of female applicants, it was not appropriate to rely on Mavis's records of applications

received to determine the expected representation of women in Mavis's hiring.  (Bendick Report ¶ 7(a)).

- Based on widely-accepted public data from the U.S. Census Bureau, the EEOC, and similar sources, a reasonable, conservative estimate of the expected representation of women in Mavis's hiring for in-store positions is 13.3% for Store Managers, 12.4% for Assistant Managers, 2.2% for Mechanics, and 5.9% for Technicians.  (*Id.* at ¶ 7(b)).

- Throughout 2008 to 2012, the number of women employed by Mavis was substantially lower than the expected employment of women.  This shortfall was present in each job category in every year examined.  (*Id.* at ¶ 7(c)).

- The shortfall in female employees observed between 2008 and 2012 included employment of zero women in all years among Technicians; zero women in all years among Mechanics; zero women among Store Managers; and one female Assistant Manager.  (*Id.* at ¶ 7(f)).

- Comparing these figures with those that would be expected in Mavis's workforce, the number of Mavis's "missing" female employees can be calculated as between:  7.4 to 16.3 Store Managers per year; 11.5 to 22.3 Assistant Managers per year; 1.9 to 4.0 Mechanics per year; and 13.0 to 26.9 Technicians per year.  (*Id.* at ¶¶ 38-41).

- Throughout 2008 to 2012, the difference between the expected employment of women in Mavis stores and their actual employment was far too large to have arisen by chance alone.  With the exception of the under-representation of women among Mechanics, where the expected number of female employees was too small for meaningful calculation of statistical significance, the under-representation of women in every job category in every year from 2008 through 2012 was statistically significant at levels ranging from 2.9 standard deviations to 5.4 standard deviations.  These numbers of standard deviations mean that the probability that the observed under-representation arose by chance alone varied from less than one chance in 100 to less

than one chance in ten million.  (*Id.* at ¶ 7(d)).[6]

Defendants retained their own expert economist, Paul F. White, Ph.D., to review the Bendick Report, discuss any concerns with Dr. Bendick's methodology and conclusions, and conduct an analysis of Mavis's hiring practices for the 2008 to 2012 time period.  (Def. 56.1 ¶ 245).  Dr. White issued his report (the "White Report" (Dkt. #97-4)) on January 17, 2014.  In relevant part, Dr. White opined that the Bendick Report was flawed in three ways:

- Dr. Bendick should have compared Mavis's hiring to a universe no broader than that of "Tire Dealers." Instead, Dr. Bendick inappropriately compared the Mavis workforce to that found in other industries whose primary purpose is different from that of a tire retailer.  Because some of the industries included in Dr. Bendick's analysis had higher proportions of female workers, his methodology resulted in an overstatement of the number of "missing" females at Mavis.  (*See* White Report 1-2, 12-16).[7]

- Dr. Bendick did not analyze the number of "hires" at Mavis during 2008 to 2012.  Instead, he compared the number of females he believes should have been present each year in the Mavis workforce with Mavis's incumbent workforce for that year.  (*Id.* at 1, 16-17)

- Dr. Bendick did not analyze female applicant availability among the applications that Mavis maintained.  His decision not to analyze the applicant flow data was based on a mere "possibility" that some applications may not be accounted for and would result

---

[6]  Dr. Bendick had also opined as to the amount of damages female applicants suffered as a result of Mavis's hiring practices.  Defendants' expert offers a competing damages analysis.  Neither of these analyses is implicated by the instant motions.

[7]  For example, Dr. Bendick took into account the percentage of females employed as "Wheeled Vehicle Repairer[s]" by the U.S. Army (5.8%), and as "Auto Maintenance Warrant Officer[s]" by the U.S. Air Force (5.1%), in estimating the expected percentage of Mavis's female Mechanics.  (Bendick Report ¶ 34).  Notably, the percentage of female employees in Dr. White's preferred pool of "Craft Workers" employed by "Tire Dealers," is only 2.3%.

> in a distortion of the female availability rate.   Dr.
> Bendick should have examined the applicant flow data
> in order to (at the very least) provide a range of potential
> availability measures.   (*Id.* at 2, 24).

Dr. White performed his own statistical analysis, using the number of individuals hired for the four positions and comparing the number of females hired with the number of females expected to be hired by companies considered Tire Dealers.  (White Report 27-29).  Notably, Dr. White looked at the number of "missing" female hires (and calculated the standard deviation) on a year-by-year basis rather than for the entire five-year period.  (*See, e.g.*, *id.* at 28).  In doing so, Dr. White concluded that the shortfall in female hiring per position, per year, was 0.82 to 2.08 for Store Managers; 2.18 to 8.51 for Assistant Managers; 2.23 to 3.57 for Mechanics; and 5.32 to 8.47 for Technicians.  (*See id.* at 27-29).  Using the shortfalls in hiring on a per-year basis, Dr. White calculated the statistical significance to be between 0.95 standard deviations and 3.07 standard deviations.  (*Id.*).

Dr. Bendick issued a rebuttal report (the "Bendick Rebuttal" (Dkt. #97-7)) on February 18, 2014.  (Pl. 56.1 ¶ 5).  First, Dr. Bendick responded to Dr. White's criticism of the use of incumbent rather than hiring data.  As it turns out, he claimed, the EEOC had requested hiring data from Defendants early on during discovery, but Defendants had not provided this data until after the Bendick Report was issued (and, indeed, not until after the White Report had been completed).  (*See* Bendick Rebuttal ¶¶ 8-10).  With the hiring data now at his disposal, Dr. Bendick modified his statistical analysis to focus on the

employees hired by Mavis during 2008 to 2012, rather than on the number of incumbent employees.  (*Id.* at ¶ 10).  Notably, Dr. Bendick concluded that "the shortfall results in the 'hiring analysis' are generally more statistically significant than those in the 'incumbent employees' analysis because the number of hiring transactions over 2008-2012 is larger than the number of incumbent employees in individual years during that period."  (*Id.* at ¶ 11; *see also id.* at ¶ 10 (reporting standard deviations ranging from 3.5 to 10.3)).

Second, the Bendick Rebuttal addressed Dr. White's opinion that the correct comparator pool consists of "Tire Dealers" rather than a broader set of employers.  (Bendick Rebuttal ¶¶ 13-20).  Dr. Bendick disagreed with White's assessment, but nonetheless repeated his analysis using Dr. White's suggested pool of Tire Dealers.  Dr. Bendick concluded that even relying on "this inappropriate estimate of availability, statistically significant shortfalls of women's hiring during 2008-2012 are still universally documented."  (*Id.* at 19; *see also id.* (reporting standard deviations ranging from 2.8 to 5.7)).

Third, Dr. Bendick addressed his rejection of Defendants' applicant flow data as unreliable, a rejection that Dr. White had criticized.  (Bendick Rebuttal ¶ 21).  Specifically, using Dr. White's tabulation of the number of applications from female applicants in Mavis's possession, Dr. Bendick concluded that the number of applications was substantially lower than the number of applications from female candidates that one would expect.  He concluded this using both his own estimate of the percentage of females in the workforce and Dr. White's estimated percentage of female workers at Tire Dealers.  (*Id.* at

¶¶ 25-26).  Using his own estimates, Dr. Bendick concluded that Mavis's application records contain: (i) 39.8% as many female applicants as expected for the Store Manager position; (ii) 69.3% as many female applicants as expected for the Assistant Manager position; (iii) 68.2% as many female applicants as expected for the Mechanic position; and (iv) 20.3% as many female applicants as expected for the Technician position.  (*Id.* at ¶ 25).  In contrast, using Dr. White's estimated percentage of females in the workforce, Dr. Bendick concluded that Mavis's application records contain: (i) 58.2% as many female applicants as expected for the Store Manager position; (ii) 86.9% as many female applicants as expected for the Assistant Manager position; (iii) 65.2% as many female applicants as expected for the Mechanic position; and (iv) 63.2% as many female applicants as expected for the Technician position. (*Id.* at ¶ 26).  Dr. Bendick concluded that these discrepancies make "it is *extremely likely* that [an] undercount [of female applicants] actually exists" in Mavis's application records.  (*Id.* at ¶ 28 (emphasis in original)).

Finally, putting aside his reservations about the reliability of the applicant flow data, Dr. Bendick performed a statistical analysis based on the applicant flow data and the number of hires per year.  (Bendick Rebuttal ¶ 29).  In other words, Dr. Bendick assumed for the sake of analysis that the percentage of Mavis's actual female applicants would equal the percentage of female employees Mavis hired for each position, and multiplied the number of hires by the percentage of female applicants to come up with the expected number of female hires.  (*See id.*).  Dr. Bendick concluded that "even …

14

apply[ing] availability figures computed from Mavis's incomplete application records, statistically significant shortfalls of women's hiring during 2008-2012 are still universally documented."  (*Id.* (reporting standard deviations ranging from 2.1 to 5.0)).

One key difference between the experts' approaches is that Dr. Bendick aggregated the hiring data before computing statistical significance, as represented in the number of standard deviations, while Dr. White looked at the data in each year separately.  (*Compare* Bendick Rebuttal ¶¶ 12, 20 ("combining five years' hiring data before computing statistical significance"), *with* White Report 27 (calculating the standard deviation based on "the shortfall number of … hires for each job during each year")).  This difference was addressed in the Bendick Rebuttal, as well as in the depositions of the experts.  Dr. Bendick explained that he initially utilized a year-by-year analysis when he performed a comparison based on *incumbent* employee data "only because the continued employment of individuals from one year to the next makes it statistically inappropriate to add together all years' workforces as though each year's workforce is independent of the workforce in previous years."  (Bendick Rebuttal ¶ 11 n.10).  However, Bendick opined that "no such issue of lack of independence arises when *hiring* decisions are analyzed, so that it is appropriate to analyze all years' hiring decision together, not separately for individual years."  (*Id.* (emphasis added); *see also* Bendick Dep. 329 ("The hypothesis I was assigned to test was that there was a pattern and practice applying across [a] five-year period of under hiring women compared to their

expected representation.  The statistical test that corresponds to that hypothesis is the one that … look[s] at the total corpus of hires across the five years[.]"); *id.* at 332 ("The hires in individual years are independent essentially of hires in other years.")).

Dr. White was questioned extensively during his deposition on his decision to analyze the data and report statistical significance on a year-by-year basis.  In his answers, Dr. White disagreed with Dr. Bendick's decision to report only aggregate data for the entire time period.  (White Dep. 30). Specifically, Dr. White contended that "[b]ecause … the hiring decisions from one year can affect the demand for employees the next year, … they're [not] totally independent decisions …. It affects the number of hires from one year to the next.  It can." (*Id.* at 30-31).  When pressed to explain the practical import of analyzing the data in the aggregate, or on a year-by-year basis, Dr. White offered the following summary:  When the data is aggregated, "for each of the four jobs across all years there is a statistically significant finding.  For some of the years it's not statistically significant on a year-to-year basis, and for some of the jobs it's … statistically significant on a year-to-year basis." (*Id.* at 45). Dr. White acknowledged that "[w]ith smaller numbers of observations in [a year-by-year] analysis it takes a larger difference between the actual and expected outcome to generate a statistically significant finding." (*Id.* at 33).  He testified, however, that in his experience, "the most common approach is to report [statistical significance] both ways" — that is, in the aggregate and on a

year-by-year basis — "[a]nd to then let attorneys and the court decide the implications from it." (*Id.* at 32).

**B.      Procedural Background**

On January 26, 2009, Nicole Haywood filed an EEOC charge of discrimination, alleging that Mavis failed to hire her because of her sex. (Pl. 56.1 ¶ 162). On February 9, 2009, the EEOC provided notice to Mavis of Haywood's charge of discrimination. (*Id.* at ¶ 163). On November 3, 2010, the EEOC issued a request for information to Mavis, asking that it provide a list of all employees identified by their name, sex, as well as other information; all applications for employment and resumes submitted to Mavis; and a list of all persons hired by Mavis. (*Id.* at ¶ 164). Thereafter, on August 5, 2011, the EEOC issued a letter of determination that stated, in part, that the EEOC had determined that: (i) "there [wa]s reasonable cause to believe that [Mavis] violated Title VII by failing to … hire [Haywood] and a class of females because of their sex"; and (ii) Mavis "fail[ed] to preserve employment applications for one year and, once the subject charge was filed, … fail[ed] to preserve application[s] until the final disposition of the charge." (*Id.* at ¶ 165).

The EEOC brought this action on January 31, 2012. (Dkt. #1). Defendants filed their Answer on April 1, 2012. (Dkt. #7). At the close of discovery, the EEOC and Defendants indicated their intent to file cross-motions for summary judgment. (Dkt. #65, 66). On November 25, 2014, the Court held a pre-motion conference to discuss the anticipated motions for summary judgment, as well as the EEOC's motion to bifurcate the trial. (*See* November

25, 2015 Conference Transcript ("Nov. 25 Tr.") (Dkt. #75)).  Although both parties argued that the trial in this action should be bifurcated and proceed in two phases, the parties did not agree as to whether the issue of punitive damages should be decided by a jury during the liability phase ("Phase I") or during the remedial phase ("Phase II").  (*See id.* at 6-10, 14-16; *see generally* Discussion Sec. A(2), *infra* (describing the liability and remedial phases of a pattern-or-practice case)).  Following the pre-motion conference, the EEOC filed its motion for summary judgment and for bifurcation of the trial on February 13, 2015.  (Dkt. #94-97).  Defendants, opting not to file the summary judgment motion they previously anticipated, filed their opposition on March 27, 2015. (Dkt. #101-04).  The motions were fully briefed upon the filing of the EEOC's reply on April 13, 2015.  (Dkt. #106-07).

## DISCUSSION

### A.    Applicable Law

#### 1.    Summary Judgment Motions Generally

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986) (internal citation and quotation marks omitted); *see also Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the

outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings.  *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles* v. *Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)).  Furthermore, "[m]ere conclusory

allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)) (internal quotation marks and citations omitted); *see also Vargas* v. *Transeau*, 514 F. Supp. 2d 439, 442 (S.D.N.Y. 2007) (observing that "the mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient" to defeat summary judgment (internal quotation marks and citations omitted)), *aff'd sub nom. Vargas* v. *Pfizer, Inc.*, 352 F. App'x 458 (2d Cir. 2009) (summary order).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). However, in considering "what may reasonably be inferred" from witness testimony, the court should not accord the non-moving party the benefit of "unreasonable inferences, or inferences at war with undisputed facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342 (S.D.N.Y. 2005) (citing *County of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir. 1990)).

### 2.    Title VII Pattern-or-Practice Discrimination

"Title VII … prohibits various forms of employment discrimination on the basis of race, color, religion, sex, or national origin." *E.E.O.C.* v. *Bloomberg L.P.*, 967 F. Supp. 2d 802, 809 (S.D.N.Y. 2013) (quotations marks and citation

omitted).  Title VII prohibits both intentional discrimination — known as disparate treatment — and unintentional discrimination practices that have a disproportionately adverse effect on a protected class — known as disparate impact.  *United States* v. *City of New York*, 713 F. Supp. 2d 300, 316 (S.D.N.Y. 2010) (citing *Ricci* v. *DeStefano*, 557 U.S. 557, 577 (2009)).  This is a disparate treatment case for sex discrimination in Defendants' hiring practices.

A pattern-or-practice claim is a particular vehicle to bring a Title VII case.  "Pattern-or-practice disparate treatment claims focus on allegations of widespread acts of intentional discrimination against individuals.  To succeed on a pattern-or-practice claim, plaintiffs must prove more than sporadic acts of discrimination; rather, they must establish that intentional discrimination was the defendant's 'standard operating procedure.'"  *Robinson* v. *Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 158 (2d Cir. 2001) (quoting *Int'l Bhd. of Teamsters* v. *United States*, 431 U.S. 324, 336 (1977)), *abrogated on other grounds by Wal-Mart Stores, Inc.* v. *Dukes*, 131 S. Ct. 2541 (2011).  In light of all the circumstances of the case, discrimination must be proven by a preponderance of the evidence to be the defendant's "regular" policy. *Teamsters*, 431 U.S. at 336; *accord United States* v. *City of New York*, 717 F.3d 72, 88 (2d Cir. 2013).

There is a "manifest" difference between claims of individual discrimination and claims of a pattern or practice of discrimination.  *Cooper* v. *Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984).  In part, this is because the Supreme Court has cautioned that isolated or individual instances

21

of discrimination, even if true, should not be construed to turn every Title VII case into "a potential companywide class action." *Gen. Tel. Co. of Sw.* v. *Falcon*, 457 U.S. 147, 159, (1982). Indeed, "courts considering what evidence is necessary to show that an employer routinely and purposely discriminated have also required substantial proof of the practice." *King* v. *Gen. Elec. Co.*, 960 F.2d 617, 624 (7th Cir. 1992); *see also In re W. Dist. Xerox Litig.*, 850 F. Supp. 1079, 1085 (W.D.N.Y. 1994) ("[T]he burden of establishing a pattern or practice of discrimination is not an easy one to carry.").

Pattern-or-practice cases proceed in two phases: a liability phase and a remedial phase. *Robinson*, 267 F.3d at 158. In the liability phase, with which the instant motion for summary judgment is concerned, "plaintiffs must produce sufficient evidence to establish a prima facie case of a policy, pattern, or practice of intentional discrimination against the protected group." *Id.* The Second Circuit has recognized that Supreme Court precedent "sets a high bar for the prima facie case the Government or a class must present in a pattern-or-practice case: evidence supporting a rebuttable presumption that an employer acted with the deliberate purpose and intent of discrimination against an entire class." *City of New York*, 717 F.3d at 87.[8]

---

[8]    As noted, the summary judgment motion concerns only the liability phase of the EEOC's pattern-or-practice case. If a plaintiff succeeds in proving liability, the court may fashion classwide injunctive relief, and then, in the second phase — known as the relief phase — individual plaintiffs may avail themselves of a rebuttable inference of discrimination in litigating a particular adverse employment decision to obtain individual relief. During this second phase, "the burden then rests on the employers to demonstrate that the individual applicant was denied an employment opportunity for lawful reasons." *Int'l Bhd. of Teamsters* v. *United States*, 431 U.S. 324, 362 (1977) (citation omitted). "This rebuttable inference arising at the relief stage, after proof by preponderance of the evidence at the liability stage of the existence of a pattern or

To establish liability, plaintiffs' cases alleging a pattern or practice of discrimination are characterized by a "heavy reliance on statistical evidence." *Reynolds* v. *Barrett*, 685 F.3d 193, 203 (2d Cir. 2012) (quoting *Robinson*, 267 F.3d at 158 n.5); *see also Attenborough* v. *Constr. & Gen. Bldg. Laborers' Local 79*, 691 F. Supp. 2d 372, 388 (S.D.N.Y. 2009) ("[S]tatistical evidence is critical to the success of a pattern-or-practice disparate treatment claim."). "[T]he liability phase is largely preoccupied with class-wide statistical evidence directed at establishing an overall pattern or practice of intentional discrimination." *Robinson*, 267 F.3d at 168.  Statistics are so central to pattern-or-practice cases that they "alone can make out a prima facie case of discrimination if the statistics reveal a gross disparity" in employee treatment. *Id.* at 158 (internal quotation marks and citation omitted); *see also Hazelwood Sch. Dist.* v. *United States*, 433 U.S. 299, 307-08 (1977) ("Where gross statistical disparities can be shown, they alone may in a proper case constitute prima facie proof of a pattern or practice of discrimination.").

Statistics, however, "are not irrefutable," and they must be viewed in light of all of the circumstances of the case.  *Teamsters*, 431 U.S. at 339.  A pattern-or-practice claim usually includes "a combination of strong statistical evidence of disparate impact coupled with anecdotal evidence of the employer's intent to treat the protected class unequally."  *Mozee* v. *Am. Comm'l Marine*

---

practice of intentional discrimination, should not be confused with the rebuttable presumption arising at the threshold of the liability stage, after presentation of only a prima facie case of such a pattern or practice."  *United States* v. *City of New York*, 717 F.3d 72, 88 n.15 (2d Cir. 2013).

*Serv. Co.*, 940 F.2d 1036, 1051 (7th Cir. 1991); *see also Robinson*, 267 F.3d at 158.

Anecdotal evidence normally serves a distinct purpose:  It brings "the cold numbers convincingly to life." *Teamsters*, 431 U.S. at 339.  "To the extent that evidence regarding specific instances of alleged discrimination is relevant during the liability stage, it simply provides 'texture' to the statistics." *Robinson*, 267 F.3d at 168; *see O'Donnell Constr. Co.* v. *Dist. of Columbia*, 963 F.2d 420, 427 (D.C. Cir. 1992) ("Anecdotal evidence is most useful as a supplement to strong statistical evidence[.]").  Therefore, "[w]hile anecdotal evidence may suffice to prove *individual* claims of discrimination, rarely, if ever, can such evidence show a systemic pattern of discrimination." *Middleton* v. *City of Flint*, 92 F.3d 396, 405 (6th Cir. 1996) (quoting *O'Donnell*, 963 F.2d at 427) (emphasis in *Middleton*).

Once a prima facie case has been established, the burden then shifts to the employer to rebut the prima facie case, that is, to demonstrate that plaintiffs' "proof is either inaccurate or insignificant." *City of New York*, 717 F.3d at 85 (quoting *Teamsters*, 431 U.S. at 360) (emphases omitted).  Defendants may "assault ... the source, accuracy, or probative force" of plaintiffs' proof. *Id.* at 86 (citation omitted).  In this setting, the employer's burden is one of production — not persuasion. *See Reeves* v. *Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000) ("This burden is one of production, not persuasion; it can involve no credibility assessment." (internal quotation marks and citation omitted)); *St. Mary's Honor Ctr.* v. *Hicks*, 509 U.S.

502, 511 (1993) ("[T]he Title VII plaintiff at all times bears the ultimate burden of persuasion" (internal quotation marks and citation omitted)); *Texas Dep't of Cmty. Affairs* v. *Burdine*, 450 U.S. 248, 255 (1981) ("If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted[.]"); *City of New York*, 717 F.3d at 85 ("[T]he rebuttal burden in [a pattern-or-practice case] is one of 'production.'" (collecting cases)).

Finally, the Second Circuit has admonished that

> [while] it is always open to a[n] [employer] to meet its burden of production by presenting a direct attack on the statistics relied upon to constitute a prima facie case[,] ... the rebuttal need not be so limited.   A defendant may rebut the inference of a discriminatory intent by accepting a plaintiff's statistics and producing non-statistical evidence to show that it lacked such an intent.

*City of New York*, 717 F.3d at 85; *see also id.* at 90 ("[T]he employer may satisfy its burden of production by 'provid[ing] a nondiscriminatory explanation for the apparently discriminatory result.'" (quoting *Teamsters*, 431 U.S. at 360)).

## B.   Analysis

### 1.   The EEOC May Bring Its Pattern-or-Practice Claim Under Section 706

As a threshold matter, Defendants argue that the EEOC does not have the authority to bring a "pattern or practice" claim under Section 706 of Title VII, 42 U.S.C. § 2000e-5(b).  (Def. Opp. 3-8).  Instead, they argue that Section 707 of Title VII, 42 U.S.C. § 2000e-6, which explicitly references "pattern or practice" suits, provides the EEOC's only avenue for maintaining such a claim. (*See* Def. Opp. 7).  *Compare* Section 706 (authorizing the "[EEOC] to

eliminate ... unlawful employment practice by informal methods of conference, conciliation, and persuasion," and providing that where "the [EEOC] has been unable to secure from the respondent a conciliation agreement ..., the [EEOC] may bring a civil action against [the] respondent"), *with* Section 707 (authorizing the EEOC to "bring a civil action" against a private entity when it "has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter").

Whether the EEOC may bring a pattern-or-practice claim under Section 706 is significant, Defendants argue, because of (i) the different burden-shifting frameworks between the two provisions and (ii) the different remedies available. (*See* Def. Opp. 7-8). On the issue of burden-shifting, Defendants argue that Section 707 claims must proceed under the *Teamsters* burden-shifting framework, *see* 431 U.S. at 336, whereas Section 706 claims proceed under the burden-shifting framework of *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792 (1973). (*See* Def. Opp. 5-6). With respect to the available remedies, Defendants note that Section 707 provides for equitable relief only, whereas Section 706 also provides for compensatory and punitive damages. (*Id.* at 6-7). In sum, Defendants claim that "the EEOC is attempting to avail itself of the more advantageous *Teamsters* burden-shifting framework applicable to [Section] 707 claims and seek compensatory and punitive damages, which are only available under [Section] 706." (*Id.* at 7).

The Second Circuit has not addressed the specific question of whether the EEOC can bring a pattern-or-practice claim under Section 706.  Indeed, the parties have not cited (and this Court could not find) a single district court within the Second Circuit to weigh in on this particular issue.  However, before addressing the merits of the parties' arguments as to whether the EEOC can bring a pattern-or-practice claim under Section 706, the Court must briefly address Defendants' reliance on two particular district court cases to support their argument.

Defendants asseverate that: (i) "[Section] 706 does *not* permit claims alleging a 'pattern or practice' of discrimination" (Def. Opp. 5 (emphasis in original)); and (ii) a "[Section] 706 and 707 'hybrid action' is simply not permitted under Title VII" (*id.* at 7).  As support for these propositions, Defendants cite the district court's opinions in *EEOC* v. *Bass Pro Outdoor World, LLC*, No. 11 Civ. 3425 (KPE) ("*Bass Pro II*"), 2013 WL 1124063, at *2 n.3 (S.D. Tex. Mar. 18, 2013), and *EEOC* v. *Bass Pro Outdoor World, LLC* ("*Bass Pro III*"), 35 F. Supp. 3d 836, 841 (S.D. Tex. 2014).  (*See* Def. Opp. 5, 7).  As the EEOC points out in its reply (Pl. Reply 3), Defendants' citation to *Bass Pro II* and *III* for support is highly misleading, since the district court in that case ultimately rejected the arguments Defendants now espouse.

The district court in *Bass Pro III* explicitly endorsed the EEOC's maintenance of a pattern-or-practice claim under Section 706 and granted the EEOC's motion for reconsideration on this very issue — thereby reversing course from its earlier pronouncements in *EEOC* v. *Bass Pro Outdoor World,*

*LLC* ("*Bass Pro I*"), 884 F. Supp. 2d 499, 520 (S.D. Tex. 2012), and *Bass Pro II*.
(*See* Pl. Reply 2-3).  Indeed, the district court in *Bass Pro III* could not have
been clearer on this point, indicating that "[u]pon exhaustive review of Title
VII's statutory scheme and the cases interpreting it, … [the court] *was wrong* to
summarily conclude in [*Bass Pro I*] that § 706 claims cannot be proven using
the *Teamsters* framework." *Bass Pro III*, 35 F. Supp. 3d at 859 (emphasis
added).[9]  Notably, the portion of *Bass Pro III* that Defendants quote in their
opposition is not native to *Bass Pro III*; it was originally in *Bass Pro I*, and was
repeated in *Bass Pro III* only as part of a recap of the procedural history of the
litigation.  (*See* Def. Opp. 7 (quoting *Bass Pro III*, 35 F. Supp. 3d at 841)).

Ordinarily, the Court would chalk up Defendants' reliance on *Bass Pro II*
and *Bass Pro III* to oversight.[10]  However, given Defendants' citation to another
obsolete district court opinion, it may represent more of a strategic choice on
their part.  Defendants chastise several district courts for "somehow ignor[ing]"
the "critical distinction[s]" between Section 706 and 707.  (Def. Opp. 7
(referring to the EEOC's position as "untenable" given "long-recognized
jurisprudence" to the contrary)).  To that end, Defendants cite *Serrano* v. *Cintas*

---

[9]     The Court notes that the district court subsequently granted the employer's motion for
an interlocutory appeal to the Fifth Circuit.  *See EEOC* v. *Bass Pro Outdoor World, LLC*
("*Bass Pro IV*"), No. 11 Civ. 3425 (KPE), 2014 WL 6453606, at *4 (S.D. Tex. Nov. 17,
2014) ("Because the question is close and because an immediate appeal will give the
Court and the parties needed certainty as to how the case should proceed to trial, the
Court will grant Defendants' motion for interlocutory appeal of the Motion to Reconsider
order.").

[10]    If, after the EEOC filed its reply, Defendants realized that they had cited in error cases
that had been reconsidered or vacated, they would have been well-served to send a
letter to the Court explaining their inadvertence.

*Corp.* ("*Serrano I*"), 711 F. Supp. 2d 782 (E.D. Mich. 2010), as an example of an opinion in which a court stood fast against such obliviousness and, in the process, "den[ied] the EEOC the right to utilize the *Teamsters* burden-shifting framework in a § 706 case." (Def. Opp. 7). What Defendants fail to acknowledge, and what the EEOC is understandably quick to point out (Pl. Reply 3), is that the district court's decision in *Serrano I* was promptly vacated and remanded by the Sixth Circuit. *Serrano* v. *Cintas Corp.* ("*Serrano II*"), 699 F.3d 884, 896 (6th Cir. 2012), *cert. denied*, 134 S. Ct. 92 (2013). Once again, the district court decision Defendants cite was explicitly overruled, and the very argument Defendants advance before this Court was rejected. *Id.* ("[W]e hold that the district court erred in concluding that the EEOC may not pursue a claim under the *Teamsters* pattern-or-practice framework, pursuant to its authority vested in § 706 of Title VII.").[11]

The Court draws attention to Defendants' citation to defunct iterations of *Bass Pro* and *Serrano* to explain why, if reliance on these decisions was indeed a strategic choice on Defendants' part, it was a poor one. Where, as here, there is no Second Circuit precedent that controls this Court's decision, Defendants had an opportunity to persuade the Court that *Bass Pro III*, *Serrano II*, and

---

[11]    Indeed, the decision in *Serrano II* should have been doubly hard for Defendants to ignore, as it featured prominently in the district court's reconsideration opinion in *Bass Pro III*. *See EEOC* v. *Bass Pro Outdoor World, LLC* ("*Bass Pro III*"), 35 F. Supp. 3d 836, 847 (S.D. Tex. 2014) ("This Court finds *Serrano [II]* persuasive .... The result in *Serrano [II]* is consistent with the statutory text and purpose, and it is supported by precedent from the Supreme Court, several courts of appeals, and other district courts"); *id.* at 850 ("Recent district court opinions confirm that *Serrano [II]* was rightly decided."); *id.* at 852 ("[T]he Court fully agrees with *Serrano [II]* that, even if *Teamsters* can be used in suits brought pursuant to § 706, there remain important distinctions between § 706 and § 707.").

their progeny, were wrongly decided.  By vociferously championing decisions
that are no longer good law, Defendants have squandered that opportunity.

Turning to the merits of the debate, the Court notes the clarity of Second
Circuit law that a pattern-or-practice case "is not a separate and free-standing
cause of action ..., but is really merely another method by which disparate
treatment can be shown." *City of New York*, 717 F.3d at 83 (quoting *Chin* v.
*Port Authority of N.Y. & N.J.*, 685 F.3d 135, 148-49 (2d Cir. 2012)).  As such,
the pattern or practice method of proof has been found to be available in some
types of discrimination actions, but not others.  *Compare Franks* v. *Bowman
Transp. Co.*, 424 U.S. 747, 772 (1976) (holding that class action plaintiffs may
"carr[y] their burden [by] demonstrating the existence of a discriminatory hiring
pattern and practice"), *Teamsters*, 431 U.S. at 362 (permitting the Government
to rely on "proof of the pattern or practice" to "support[] [the] inference" of
discrimination under Section 707), *and Burgis* v. *N.Y.C. Dep't of Sanitation*,
— F.3d —, No. 14-1640-cv, 2015 WL 4590507, at *3 (2d Cir. July 31, 2015)
(finding that "in the context of a putative class action alleging employment
discrimination under § 1981 and/or the Equal Protection Clause," "in certain
circumstances[,] ... statistics alone may be sufficient" "to warrant a plausible
inference of discriminatory intent if they show a pattern or practice that cannot
be explained except on the basis of intentional discrimination"), *with Chin*, 685
F.3d at 150 (holding that "the pattern-or-practice method of proof is *not*
available to nonclass, private plaintiffs" (emphasis added)).

The Court finds the opinions in *Serrano II* and *Bass Pro III* to be persuasive on the issue of whether the EEOC can use the pattern or practice method of proof in suits brought under Section 706.[12]  To the extent the Court draws liberally from these opinions, it is because they are thorough and well-reasoned.  Reliance on these decisions also makes a great deal of practical sense, as the courts in *Serrano II* and *Bass Pro III* considered and rejected each of the arguments that Defendants propound here, and, as noted *supra*, Defendants have not given the Court any reason to think they were wrongly decided.

First, permitting the EEOC to bring pattern-or-practice cases under Section 706 does not "render § 707 meaningless or … superfluous[.]"  (Def. Opp. 7).  As the court in *Bass Pro III* explained, there are at least three circumstances under which the EEOC might initiate an action under Section

---

[12]    As the Court in *Bass Pro IV* noted, "in general, opportunities for courts of appeals to address this question are rare" because "[s]ettlement pressures typically end large-scale employment discrimination cases before the entry of an appealable final judgment." 2014 WL 6453606, at *3.  That is not to say that *Serrano II* stands alone in extending the "pattern or practice" method of proof to Section 706 cases brought by the EEOC. Rather, the decision in *Bass Pro III* represents a growing trend of district courts that have adopted the Sixth Circuit's logic, and permitted the EEOC to bring Section 706 pattern-or-practice cases in the wake of *Serrano II*.  *See EEOC* v. *PMT Corp.*, No. 14 Civ. 599 (DSD) (TNL), 2015 WL 5026029, at *3 (D. Minn. Aug. 24, 2015) ("Whether the EEOC proceeds under its authority in § 706 or § 707, however, does not restrict the EEOC's ability to assert a pattern-or-practice claim."); *EEOC* v. *Rosebud Restaurants, Inc.*, No. 13 Civ. 6656 (ARW), 2015 WL 1594067, at *2 (N.D. Ill. Apr. 7, 2015) ("Because widespread discriminatory actions are within the category of discrimination prohibited by Title VII, they are also within the authority granted to the EEOC by § 706." (internal citation omitted)); *David* v. *Signal Int'l, LLC*, 37 F. Supp. 3d 814, 820 (E.D. La. 2013) ("[T]his Court finds the Sixth Circuit decision in *Serrano [II]* persuasive and clarifies its [previous order] by specifying that the EEOC may bring its pattern and practice claims under both §§ 706 and 707 using the *Teamsters* framework[.]"); *EEOC* v. *Pitre, Inc.*, 908 F. Supp. 2d 1165, 1174 (D.N.M. 2012) ("Section 706 does not prevent the EEOC from seeking relief for individuals and the general public under a pattern-or-practice theory.").

707 instead of under Section 706: (i) where the EEOC "has 'reasonable cause' to believe such a suit necessary" but where no individual has "file[d] a charge against the employer," 35 F. Supp. 3d at 852 (citations omitted); (ii) where the EEOC wishes to avoid "intervention as of right by parties aggrieved," *id.* at 852-53; and (iii) where the EEOC intends "to request a three-judge district court in [a] case[] of 'general public importance,' and to appeal a ruling by such a court directly to the Supreme Court," *id.* at 853.  These differences vitiate the argument that Section 707 will be rendered superfluous if the EEOC can maintain a pattern-or-practice claim under Section 706.  *See generally Skilling* v. *United States*, 561 U.S. 358, 413 n.45 (2010) ("Overlap with other federal statutes does not render [a statute] superfluous.").

Second, and more fundamentally, the Court does not view an interpretation that results in statutory overlap as running contrary to Congress's intent.  (*See* Def. Opp. 7-8).  The Court finds it perfectly rational that, "in an effort to ensure that the EEOC could prevent unlawful employment practices, Congress opted to give the EEOC broad and overlapping authority." *EEOC* v. *Pitre, Inc.*, 908 F. Supp. 2d 1165, 1173 (D.N.M. 2012) (internal citation omitted).  The conclusion that "Sections 706 and 707 clearly overlap, providing the EEOC with multiple routes to bring employers who engage in unlawful discrimination to justice," *id.* at 1173-74, is unsurprising.  Indeed "legislative enactments in [the] area [of employment discrimination] have long evinced a general intent to accord parallel or overlapping remedies against discrimination." *Alexander* v. *Gardner-Denver Co.*, 415 U.S. 36, 47 (1974); *see,*

*e.g.*, *Anderson* v. *Conboy*, 156 F.3d 167, 180 (2d Cir. 1998) ("[W]ith respect to race discrimination, Title VII and Section 1981 coexist despite partially overlapping coverage." (citation omitted)).

Third, the Court disagrees with Defendants that any unfairness inures to employers from the application of the *Teamsters* burden-shifting framework rather than the *McDonnell Douglas* framework.  (*See* Def. Opp. 7 (arguing that the EEOC is seeking to "avail itself of the more advantageous *Teamsters* burden-shifting framework applicable to § 707")).  As the Sixth Circuit has explained,

> This argument is based on a mistaken premise.  The *Teamsters* framework is not an inherently easier standard of proof; it is simply a different standard of proof.  Indeed, under *Teamsters*, the plaintiff's initial burden to make out a prima facie case is heightened ....  [U]nder *Teamsters* the plaintiff must demonstrate the existence of a discriminatory procedure or policy.  This is no simple task, as the plaintiff must prove that discrimination was the company's standard operating procedure — the regular rather than the unusual practice ....  Thus, the EEOC must always weigh the risks — as well as the benefits — of proceeding under the *Teamsters* framework, for doing so involves a greater chance of losing at the prima facie stage.

*Serrano II*, 699 F.3d at 896 (internal citations and quotation marks omitted); *see also City of New York*, 717 F.3d at 87 ("*Teamsters* sets a high bar for the prima facie case the Government or a class must present in a pattern-or-practice case[.]").  This argument also glosses over the fact that the *Teamsters* framework is routinely used in pattern-or-practice cases under Section 706 brought as private class actions.  *See Chin*, 685 F.3d at 148 (noting that the

33

pattern or practice "method of proof ... originated in the class action context, in *Franks*"); *see also Bass Pro III*, 35 F. Supp. 3d at 849 (finding "no principled reason why a private class action may employ *Teamsters* and an EEOC class action may not").

Finally, the Court rejects Defendants' argument that Congress, in amending Title VII to make compensatory and punitive damages available under Section 706 but not Section 707, "expressly chose to leave equitable relief the only remedy for the EEOC pattern[-]or[-]practice claims." (Def. Opp. 6-7). As the court in *Bass Pro III* noted, "[t]his argument misses the mark":

> Congress *did* intend to make compensatory and punitive damages available to victims of a discriminatory pattern or practice, it just required that they — or the EEOC — seek them in a § 706 suit. Simple logic bears this out. Wherever there is a pattern or practice of discrimination, it is axiomatic that there are individual victims who have been discriminated against. These are the *same individuals* that could bring their own § 706 suit or whose rights the EEOC could seek to vindicate in its own § 706 action. Consequently, to hold ... that the EEOC cannot seek ... damages for victims of a discriminatory pattern or practice would be to place these individuals in a *worse position* than those who are discriminated against in a series of isolated incidents. [It] is impossible to believe [that is what] Congress intended.

*Bass Pro III*, 35 F. Supp. 3d at 853 (emphases in original, footnote and internal quotation marks omitted). Accordingly, the Court finds that the EEOC may

maintain a pattern-or-practice claim under Section 706 as well as under Section 707.[13]

### 2. Summary Judgment on the EEOC's Pattern-or-Practice Claim Is Denied

Turning now to the merits, the EEOC has moved for summary judgment on its pattern-or-practice claim, contending that its expert's findings of Defendants' statistically significant hiring shortfalls of female employees, the presence of an "inexorable zero" of female hires, and the anecdotal evidence from female applicants "conclusively show that Mavis engaged in a pattern or practice of discrimination against hiring women."  (Pl. Br. 19).  Defendants respond that genuine issues of material fact remain, such that summary judgment is inappropriate.  (*See* Def. Opp. 14).  Specifically, Defendants maintain that Mavis's "decentralized hiring practice … diminishe[s] [the] significance of any statistical shortfalls" (*id.* at 16); the "disagreement between the parties' respective experts" regarding whether to aggregate data before

---

[13]    Defendants half-heartedly argue that the EEOC failed adequately to plead a pattern-or-practice claim under Section 706.  (*See* Def. Opp. 3 (arguing in passing that "Plaintiff[] fail[ed] to plead a claim for pattern or practice of sex discrimination")).  Defendants are mistaken.  (*See* Compl. ¶ 8(b) ("Defendants' hiring system disproportionately excludes women from employment and constitutes a pattern or practice of discrimination against women.")).  Regardless, even if the EEOC had failed to specify that it intended to utilize a pattern-or-practice method of proof in prosecuting its case, it is not at all clear that its pleading would have been deficient.  *See EEOC* v. *Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) ("[A] discrimination complaint need not allege facts establishing each element of a prima facie case of discrimination to survive a motion to dismiss[.]") (citing *Swierkiewicz* v. *Sorema N. A.*, 534 U.S. 506, 510-11 (2002) ("The prima facie case under *McDonnell Douglas* … is an evidentiary standard, not a pleading requirement …. This Court has never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss.")); *Serrano II*, 699 F.3d at 897 ("*Swierkiewicz* compels the conclusion that a plaintiff is not required to plead whether she intends to employ the *McDonnell Douglas* or the *Teamsters* burden-shifting evidentiary framework.").

computing statistical significance "confirms that issues of fact … exist" (*id.* at 21); and anecdotal evidence of those who applied to Mavis "only highlight[s] the multitude of disputed issues of fact" because at least some of the claimants "candidly testified that they did not believe gender had anything to do with why they were denied employment with Mavis *until the EEOC contacted them*" (*id.* at 23 (emphasis in original)).   In reply, the EEOC argues that Defendants have failed to rebut the EEOC's prima facie case grounded in statistical evidence. (Pl. Reply 8-9).   Although this presents a very close case, the Court is persuaded that Defendants have (albeit barely) met their burden of production under the *Teamsters* framework.   Summary judgment is therefore inappropriate, and the issue of Defendants' liability must go to trial.

As a preliminary matter, the Court notes that both sides would have been better served making arguments more directly aimed at their respective burdens under the *Teamsters* framework.   Defendants, while understandably trying to draw attention to the existence of genuine issues of material fact, largely ignore the burden they face on summary judgment — namely that of rebutting the EEOC's prima facie case.   The EEOC, while justifiably confident that it has stated a prima facie case, fails to argue why precisely it believes that Defendants have failed to meet their countervailing burden of production under *Teamsters*.

Within the *Teamsters* framework, the EEOC has presented an incontestably strong prima facie case.   As with most pattern-or-practice cases, the Court begins with an analysis of the EEOC's statistical evidence of hiring

disparities.  The Court is mindful that "[n]ot all disparities ... are probative of discrimination.  Before a deviation from a predicted outcome can be considered probative, the deviation must be 'statistically significant.'" *Ottaviani* v. *State Univ. of N.Y. at New Paltz*, 875 F.2d 365, 371 (2d Cir. 1989).  "A finding of two standard deviations corresponds approximately to a one-in-twenty, or five percent, chance that a disparity is merely a random deviation from the norm, and most social scientists accept two standard deviations as a threshold level of 'statistical significance.'" *Id.*  While courts have rejected the finding of two standard deviations as "a formal 'litmus' test for assessing the legitimacy of Title VII claims[,] ... [i]t is certainly true that a finding of two to three standard deviations can be highly probative of discriminatory treatment." *Id.* at 372 (citations omitted).[14]

Here, the EEOC has presented statistical evidence that demonstrates the disparities in hiring female employees by Defendants is exceedingly unlikely to have been caused by chance.  Dr. Bendick frequently refers to the disparities he identifies as "statistically significant," and he is correct.  In each of Dr. Bendick's analyses, for each of the four positions, he calculates a standard deviation of two or more.  When Dr. Bendick looked at Defendants' incumbent employee data (before Defendants had produced their hiring data), he reported

---

[14]    Care should be exercised, when looking at the number of standard deviations, not to ascribe any overt significance to the value of the integer.  As noted previously, "two standard deviations corresponds roughly to a 1-in-20 chance that the outcome is a random fluctuation.  Three standard deviations corresponds to approximately a 1-in-384 chance of randomness.  Finally, a range of four to five standard deviations corresponds to a probability range of 1 chance in 15,786 to 1 chance in 1,742,160. *Ottaviani* v. *State Univ. of N.Y. at New Paltz*, 875 F.2d 365, 372 n.7 (2d Cir. 1989).

standard deviations of between 2.9 and 5.4; when he focused on their hiring data, he found disparities even more severe, between 3.5 and 10.3; when he limited his approach to consider the workforce only of "Tire Dealers," as per Dr. White's preference, he still found standard deviations ranging from 2.8 to 5.7; and, finally, when he considered Defendants' actual applicant flow data, he reported standard deviations ranging from 2.1 to 5.0.  This statistical evidence, which has been "finely tuned to the relevant labor pool," would likely be sufficient to establish a prima facie case without other evidence.  *Segar* v. *Smith*, 738 F.2d 1249, 1278 (D.C. Cir. 1984) ("When … statistical evidence is … finely tuned to the relevant labor pool, gross disparities need not be shown to permit an inference of discrimination."); *see also Hazelwood,* 433 U.S. at 307-08 ("[G]ross statistical disparities … may in a proper case constitute prima facie proof of a pattern or practice of discrimination."); *City of New York*, 717 F.3d at 84 ("[I]nstances of discrimination against particular employees are relevant to show a policy of intentional discrimination, [but] they are not required; a statistical showing of disparate impact might suffice[.]").

To the extent there was any doubt as to the sufficiency of the EEOC's prima facie case, however, the statistical analysis is buttressed by the undisputed fact that Defendants hired zero female Store Managers, Mechanics, or Technicians from 2008 to 2012, during which time they hired 80 male Store Managers, 655 male Mechanics, and 1,688 male Technicians.  "[F]ine tuning of the statistics could not have obscured the glaring absence" of female employees hired for these positions.  *Teamsters*, 431 U.S. at 342 n.23; *see, e.g., Victory* v.

*Hewlett-Packard Co.*, 34 F. Supp. 2d 809, 823-24 (E.D.N.Y. 1999) (finding that plaintiff had raised "inference of gender discrimination" based in part on "the troubling fact that nary a single female sales representative ha[d] ever been promoted to a managerial position").

The Court is hesitant to embrace fully the EEOC's argument regarding "the inexorable zero" of female hires. *See Teamsters*, 431 U.S. at 342 n.23 ("[T]he inference of discrimination came not from a misuse of statistics but from 'the inexorable zero.'"); *e.g.*, *Capaci* v. *Katz & Besthoff, Inc.*, 711 F.2d 647, 662 (5th Cir. 1983) ("To the noble theoretician predicting the collisions of weightless elephants on frictionless roller skates, zero may be just another integer, but to us it carries special significance in discerning ... policies and attitudes."); *United States* v. *City of New York*, 713 F. Supp. 2d 300, 318 (S.D.N.Y. 2010) ("[A] court cannot help but be circumspect where a municipal department in the country's largest city repeatedly selects only applicants of one sex for job vacancies — after all, zero is not just another number." (internal quotation marks and citation omitted)). Here, it is undisputed that Defendants *did* hire one female Assistant Manager. However, the power of the raw numbers (and the inference these numbers support) is dissipated only slightly, if at all, by Defendants' hiring of a single female Assistant Manager during a span of five years. There is still, as the Court in *Teamsters* put it, "a glaring absence" of female employees. *See EEOC* v. *Andrew Corp.*, No. 81 Civ. 4359 (EEB), 1989 WL 32884, at *14 (N.D. Ill. Apr. 3, 1989) (noting that, despite the occasional hiring of minority applicants, the data was nonetheless "dominated

39

by the 'inexorable zero' and [could not] be 'explained away'").  After all, the
inference of discrimination stemming from Defendants' hiring of zero female
Store Managers, Mechanics, and Technicians remains strong; notably, the
"inexorable zero" of female hires is paired with evidence — both in the
anecdotal accounts of claimants and in Defendants' application records — of
actual female applicants for each of the positions.  *Cf. Ortiz-Del Valle* v. *Nat'l
Basketball Ass'n*, 42 F. Supp. 2d 334, 338 n.1 (S.D.N.Y. 1999) (noting that the
inference created by the "inexorable zero" "may be weak [where there is] scant
evidence of other women who applied and were rejected").  Moreover, although
the EEOC cannot claim that Defendants failed to hire a single female Assistant
Manager during this time period, it is noteworthy that, looking at Defendants'
applicant flow data, the disparity in hiring of female Assistant Managers is the
most statistically significant among all four positions.  (*See* Bendick Rebuttal
¶ 29 (reporting a standard deviation of 5.0)).  Put another way, Defendants'
hiring of only one Assistant Manager is even more conspicuous (and even more
supportive of the inference of discrimination) than "the inexorable zero" found
in the positions of Store Managers, Mechanics, or Technicians.

Finally, the Court finds that the EEOC has bolstered its prima facie case
with anecdotal evidence that "provides 'texture' to the statistics," *Robinson*, 267
F.3d at 168, and further lends credence to the inference of discrimination.  For
example, Haywood was not hired for a position, even though three of her male
colleagues — individuals she had trained to perform work at another
automotive store — were.  (*See* Haywood Dep. 132-33).  Murnane similarly was

told by a Mavis employee, "don't get your hopes up, you're a chic[k]. These guys are old school." (Murnane Dep. 79). She was also told by a manager at Mavis that she would not be hired because the "guys would stare" at her during work. (*Id.* at 80). Other female applicants, such as Jackson and Braly, were treated dismissively during the application process and never contacted. (*See* Pl. 56.1 ¶¶ 125, 137). Taking the EEOC's proffered statistical and anecdotal evidence together, the Court finds no difficulty in finding that the prima facie burden has been met.

Under *Teamsters*, the burden thus shifts to Defendants to "satisfy [their] burden of production by 'provid[ing] a nondiscriminatory explanation for the apparently discriminatory result.'" *City of New York*, 717 F.3d at 90 (quoting *Teamsters*, 431 U.S. at 360)). The Court must allow that Defendants, in part because they fail to press the import of their burden as one of *production* under the *Teamsters* framework, come perilously close to failing to rebut the prima facie case to any degree. That Defendants' burden is one of *production* — and how courts have interpreted this burden in pattern-or-practice cases — ultimately saves them from summary judgment.

"In the nature of things, the determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment. For the burden-of-production determination necessarily precedes the credibility-assessment stage." *St. Mary's Honor Ctr.*, 509 U.S. at 509. "If the defendant fails to rebut the plaintiff's prima facie case, the presumption arising from an

unrebutted prima facie case entitles the plaintiff to prevail on the issue of liability and proceed directly to the issue of appropriate relief." *Id.* "An employer facing [the] serious accusation [of intentional discrimination] must have a broad opportunity to present in rebuttal any relevant evidence that shows that it lacked such an intent." *City of New York*, 717 F.3d at 87.  That said, "[a]t a minimum the employer must raise a genuine issue of fact as to the veracity of plaintiffs' proof, and '[t]o accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for' the observed disparity." *Segar*, 738 F.2d at 1287 (quoting *Burdine*, 450 U.S. at 254-55)).

Defendants' rebuttal consists of an alternative statistical analysis, an attack on the probative value of the EEOC's statistical analysis, and various challenges to the anecdotal evidence.  (*See* Def. Opp. 16-26).  The "central issue in the pending case is what showing an employer must make to satisfy its burden of production in a pattern-or-practice case." *City of New York*, 717 F.3d at 85.  Conscious of the fact that the burden Defendants face *now* is not the burden they will face at trial, the Court is compelled to deem Defendants' rebuttal to be sufficient.  *See EEOC* v. *Joint Apprenticeship Comm. of Joint Indus. Bd. of Elec. Indus.*, 186 F.3d 110, 122 (2d Cir. 1999) (warning, in a disparate impact case, against "plac[ing] too high a burden on the defendant, which bears only the burden of production, not of proof" and "infring[ing] upon the province of the fact-finder, whose job it is to weigh the persuasiveness of defendant's evidence"); *EEOC* v. *Sears, Roebuck & Co.*, 839 F.2d 302, 309 (7th

Cir. 1988) ("[An employer does] not have a burden of producing more compelling evidence than ... the EEOC."); *EEOC* v. *Freeman*, 961 F. Supp. 2d 783, 799 (D. Md. 2013) ("The burden is not on Defendant to conduct its own analysis to rebut the results produced by the EEOC's flawed report.  It is sufficient for Defendant to point out the numerous fallacies in [the EEOC's] report, which raise the specter of unreliability."), *aff'd*, 778 F.3d 463 (4th Cir. 2015).

Defendants have not provided the Court with "a nondiscriminatory explanation for the apparently discriminatory result." *Teamsters*, 431 U.S. at 360 n.46.  Implicitly, perhaps, they argue that they always hire the most qualified applicants, but they have not endeavored to show in any categorical fashion that the female applicants rejected were less qualified than the males they hired.  Instead, they rebut the prima facie case by arguing that the observed statistical disparities are not as statistically significant as they appear to be.  (*See* Def. Opp. 19).  Indeed, Dr. White, who looked at the data on a year-by-year basis, found disparities generally in the one-to-three standard deviation range.  (*See* White Report 27-29).

For example, for the Store Manager position, Dr. White found a yearly shortfall of between 0.82 and 2.08 female hires, resulting in a standard deviation of between 0.95 and 1.51 per year.  According to Dr. White's preferred methodology, analysis of Defendants' hiring of female Store Managers would fail to reach the widely-accepted threshold of a statistical significance represented by two standard deviations.  Although Dr. White's contrary finding

would not be sufficient to defeat Plaintiff's prima facie case — in the sense that

Defendants could not hope to prevail on a motion for summary judgment of

their own — the Court cannot say that it offers no rebuttal to Plaintiff's prima

facie case.[15]  Indeed, given the reluctance of courts to imbue any particular

statistical threshold with outcome-determinative power in the context of

evaluating a plaintiff's establishment of a prima facie case, *see, e.g.*, *Ottaviani*,

875 F.2d at 373 ("[T]here simply is no minimum threshold level of statistical

significance which mandates a finding that Title VII plaintiffs have made out a

prima facie case[.]"), a court should be equally (if not more) circumspect in

letting a particular level of statistical significance decide, as a matter of law, the

critical issue of a defendant's liability.

The EEOC objects to Defendants' tack of raising an issue of fact by

presenting expert analysis that looks at the data in a different fashion, yet this

does not strike the Court as unusual.  A battle of statisticians is to be expected

in a pattern-or-practice case.  What the Court does find unusual is the EEOC's

attempt to raise the specter of a *Daubert* motion now in its reply brief.  (*See* Pl.

Reply 6-7 (citing *Daubert* v. *Merrell Dow Pharmaceuticals*, 509 U.S. 579

---

[15]    The precise weight of a defendant's burden of production on rebuttal was a point of
dissension in the *City of New York* case, with the majority opting not to impose the
heavy burden that the dissent felt was warranted.  *Compare City of New York*, 717 F.3d
at 107 (Pooler, C.J., dissenting) ("I think the City was required both under the law of
this Circuit and the Supreme Court to show more.  At the outset, the majority
recognizes that '[i]n a pattern-or-practice case, the plaintiff's initial burden is heavier,'
however, it fails to recognize that a similarly heavy burden also exists for the defendant-
employer under *Teamsters*."), *and id.* at 110 ("It is well recognized among other Circuits
that the employer must *defeat* the Government's statistical proof." (emphasis added),
*with id.* at 84 (majority opinion) ("'[D]efeat' might be thought to imply something
stronger that 'rebut,' but the [Supreme] Court's language indicates that the Court
means the same thing in both contexts.").

(1993))).[16]  The EEOC was aware, as of the filing of Dr. White's report in January 2014, that he approached the data in a manner different than Dr. Bendick.  The debate over the year-by-year analysis featured prominently in both experts' depositions, which took place in October 2014, well before the parties submitted their motion papers.  Yet neither party opted to challenge the opposing expert's approach as unreliable by filing a *Daubert* motion.[17]

Although the Court need not address this issue, because it was raised only in reply, *see, e.g.*, *Evangelista* v. *Ashcroft*, 359 F.3d 145, 156 n.4 (2d Cir. 2004), it will briefly respond here in recognition of its unique gatekeeping role when it comes to evidentiary matters, *see, e.g.*, *Brenord* v. *Catholic Med. Ctr. of Brooklyn & Queens, Inc.,* 133 F. Supp. 2d 179, 188 n.4 (E.D.N.Y. 2001) (engaging in a *sua sponte* inquiry into qualifications of an expert under *Daubert*) (collecting cases).  Here, Dr. White gave explanations during his deposition for why he thought a year-by-year breakdown was appropriate (*viz.*, that hiring from past years influences hiring decisions of the next year).  This explanation is open to challenge (*see* Pl. Br. 15-16), but the Court cannot say Dr. White's opinions are inadmissible.  "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method" does not itself require exclusion under *Daubert*; exclusion is only warranted "if the flaw is large

---

[16]   Although the EEOC challenged Dr. White's approach in its opening brief (Pl. Br. 15-16), it did not cite *Daubert* or suggest that Dr. White's findings would be inadmissible.

[17]   Rule 4(G) of this Court's Individual Rules of Practice in Civil Cases provide that all "motions to exclude testimony of experts must be made by the deadline for dispositive motions and should not be treated as motions *in limine*."  Accordingly, a *Daubert* motion should have been filed concurrently with the EEOC's motion for summary judgment.

enough that the expert lacks good grounds for his or her conclusions."
*Amorgianos* v. *Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002)
(citation and quotation marks omitted).  This is because "our adversary system
provides the necessary tools for challenging reliable, albeit debatable, expert
testimony."  *Id.*  "[V]igorous cross-examination, presentation of contrary
evidence, and careful instruction on the burden of proof are the traditional and
appropriate means of attacking shaky but admissible evidence."  *Id.* (quoting
*Daubert*, 509 U.S. at 596).

Dr. White further testified that, in his experience, both aggregated and
year-by-year approaches are used in cases such as this.  And that is precisely
what the jury will see and hear in this case, with each party presumably
attempting to undermine the other's approach during cross-examination.  The
jury will then decide whether to credit Dr. Bendick's approach or Dr. White's
approach.  *See Port Auth. Police Asian Jade Soc. of N.Y. & N.J. Inc.* v. *Port Auth.
of N.Y. & N.J.*, 681 F. Supp. 2d 456, 466-67 (S.D.N.Y. 2010) ("It is the jury's
role to decide between competing conclusions based on the data and
analysis."); *Victory*, 34 F. Supp. 2d at 824 (denying summary judgment in a
pattern-or-practice case with conflicting statistical evidence and noting that the
"[r]esolution of the battle of experts is a matter best suited for the trier of fact").

Additionally, Defendants have challenged the probative nature of the
statistical evidence because of their "decentralized" hiring system.  (Def.
Opp. 16).  "Where uncoordinated and independent employment decisions are
made by different persons, statistics as to hiring by the overall entity may be

less significant in demonstrating bias than where a single office makes all employment decisions." *Coser* v. *Moore*, 739 F.2d 746, 750 (2d Cir. 1984). An "assault on the … probative force" of statistical evidence is undoubtedly a valid way for an employer to meet its burden of production on rebuttal. Again, the Court cannot and need not say that a jury will accept this argument, and, if it does, that this evidence can overcome the sheer power of the EEOC's statistical evidence. It matters not; Defendants' burden at this stage is merely one of production. *See Dothard* v. *Rawlinson*, 433 U.S. 321, 338-39 (1977) (Rehnquist, J., concurring) ("If the defendants in a Title VII suit believe there to be reason to discredit plaintiffs' statistics that does not appear on their face, the opportunity to challenge them is available to the defendants just as in any other lawsuit. They may endeavor to impeach the reliability of the statistical evidence, they may offer rebutting evidence, or they may disparage in arguments or in briefs the probative weight which the plaintiffs' evidence should be accorded.").

To that same end, Defendants offer evidence rebutting the EEOC's anecdotal evidence regarding individual applicants' experiences. Although neither side's presentation of anecdotal evidence will be dispositive of class-wide liability for a pattern or practice of discrimination, the Court cannot say that Defendants failed to satisfy their burden of production with respect to meeting anecdotal evidence the EEOC supplied. For all of these reasons, and even while recognizing the strength of the EEOC's case, the Court will deny its motion for summary judgment on the pattern-or-practice claim.

### 3. Summary Judgment on the EEOC's Record-Keeping Claim Is Denied

In addition to seeking summary judgment on its charge of discrimination under Title VII, the EEOC also moves the Court to grant summary judgment on its Title VII record-keeping claim.  (*See* Pl. Br. 20-24).  In sum, the EEOC argues that there is no genuine issue of material fact remaining as to whether Defendants retained personnel records (including applications for employment), as required by Section 709(c) of Title VII, 42 U.S.C. § 2000e-8(c), and 29 C.F.R. § 1602.14.  (Pl. Br. 20).  Summary judgment is warranted, according to the EEOC, because Defendants had no formal system for maintaining these records, their employees conceded that not all applications were retained, and several of the claimants' applications could not be located.  (*Id.* at 21).  The Court must disagree.

Section 709(c) provides that: "[e]very employer ... shall [i] make and keep such records relevant to the determinations of whether unlawful employment practices have been or are being committed, [ii] preserve such records for such periods, and [iii] make such reports therefrom as the Commission shall prescribe by regulation[.]"  42 U.S.C. § 2000e-8(c).  In turn, the applicable regulation requires that:

> Any personnel or employment record made or kept by an employer (including but not necessarily limited to ... application forms submitted by applicants and other records having to do with hiring ... ) shall be preserved by the employer for a period of one year from the date of the making of the record or the personnel action involved, whichever occurs later .... Where a charge of discrimination has been filed, ... the respondent employer shall preserve all personnel records relevant

48

> to the charge or action until final disposition of the
> charge or the action.

29 C.F.R. § 1602.14.  No monetary sanctions are provided for violations of

Section 709(c) and 29 C.F.R. § 1602.14; the only relief available is equitable in

nature.  *See EEOC* v. *AutoZone, Inc.*, No. 06 Civ. 1767 (PCT) (PGR), 2008 WL

4418160, at *6 n.14 (D. Ariz. Sept. 29, 2008).

Defendants' retention procedures are not immune from criticism.

However, the Court cannot say, as a matter of law, that Defendants failed to

retain applications in violation of Section 709(c).  Mavis retained more than

19,400 pages of applications and resumes, and produced these records to the

EEOC.  (*See* Def. Opp. 9).  *See EEOC* v. *LA Weight Loss*, 509 F. Supp. 2d 527,

540 (D. Md. 2007) (summary judgment was inappropriate where the employer

"produce[d] evidence demonstrating that it … maintained a policy of retaining

documents, resumes, and interview notes …, and … attempted to make

applicant data from internet job-posting services available to the EEOC").

While the claimants' testimony regarding the number of times they applied is

relevant circumstantial evidence, and might convince a jury that Mavis's

retention must have been imperfect, this testimony is not uncontroverted.

Defendants claim that there was a retention policy in place, and that despite

being unwritten, this policy worked.  (*See* Def. 56.1 Response ¶¶ 184-200).  *Cf.*

*AutoZone*, 2008 WL 4418160, at *6 (finding summary judgment appropriate

where the employer "specifically admit[ted] that the specified documents …

existed and that they related to [the claimant], that the specified documents

had been in the possession of [the employer], and that it ha[d] not produced to

the EEOC any of the specified documents").  They also claim that they did not selectively delete or throw away applications from certain candidates.  (*See* Andre 30(b)(6) Dep. 353-54 ("I can tell you what didn't happen.  We didn't cherry pick them and throw them away.")).  *Cf. EEOC* v. *Oak-Rite Mfg. Corp.*, No. 99 Civ. 1962 (DFH), 2001 WL 1168156, at *17 (S.D. Ind. Aug. 27, 2001) (awarding summary judgment on record-keeping claim where employer "testified that applications of rejected applicants were being thrown away").  Although the jury may well conclude, after hearing from witnesses, that one side offers more credible evidence, the Court is not permitted to make such a credibility determination on summary judgment.  Genuine issues of material fact remain.

Having determined that this issue too will go to trial, the Court need not reach the EEOC's request for a finding of spoliation.  However, given the extraordinary remedy the EEOC proposes — namely, "that the Court … issue an adverse inference instruction to the jury instructing that all damages it awards in the form of out-of-pocket losses (lost wages and benefits) and interest, and punitive damages, should be based on the shortfall of women in the positions at issue [as identified by the EEOC's expert] and not just on the number of claimants" (Pl. Opp. 27) — the issue of spoliation merits some discussion.

In the context of a Section 709(c) claim, in order to make a finding of spoliation, the Court does not need evidence of the employer's "bad faith"; still, there must be "evidence of intentional destruction."  *Byrnie* v. *Town of*

50

*Cromwell, Bd. of Educ.*, 243 F.3d 93, 109 (2d Cir. 2001); *accord Zimmermann* v. *Assocs. First Capital Corp.*, 251 F.3d 376, 383 (2d Cir. 2001).  Here, at the summary judgment stage, issues of fact remain as to whether Defendants intentionally destroyed any applications.  (*See* Def. Opp. 30-33 (noting that some applications may have been submitted before Defendants' duty to retain was triggered and arguing that there was inconsistent testimony from the claimants as to the number of applications they submitted)).  *Cf. Byrnie*, 243 F.3d at 109 (finding spoliation where the employer "admitted its policy to destroy ... records soon after the hiring process had been completed and that the records in this case were so destroyed" and "[a]t no point ... asserted that their destruction was merely accidental").

Perhaps more significant than the request for a finding of spoliation is the EEOC's request that this Court instruct the jury to award monetary damages (both compensatory and punitive) based on a hypothetical number of female applicants whose applications may have been discarded.  Although the Court is generally aware that the EEOC takes an aggressive posture toward vindicating the rights of discrimination claimants, the Court is not aware of a similar attempt to, essentially, shoehorn monetary damages into Section 709(c), which provides only for injunctive relief, or otherwise artificially augment the monetary damages allocated to victims of discrimination through an adverse inference.  At the risk of hyperbole, it appears to the Court that the EEOC has attempted to shoot the moon here.  While the Court can, after a finding of intentional destruction of documents relevant to discrimination

51

plaintiffs' claims, imagine an adverse inference instruction that permitted a jury to infer that lost documents would have further supported the *liability* of an employer for discriminatory practices, *see, e.g.*, *Byrnie*, 243 F.3d at 110 (finding "enough circumstantial evidence exists to permit a reasonable trier of fact to conclude that the destroyed documents would show unlawful discrimination"), the Court cannot imagine (and the EEOC has not cited) a case in which a jury is instructed to award *damages*, both compensatory and punitive, based on the inference that additional claimants exist.

While the EEOC twice refers to this as a "modest remedy" (Pl. Br. 27, 28), the Court finds the proposed remedy to be ill-conceived from both a practical and constitutional standpoint. The proposed "compensatory" damages based on hypothetical applicants either would not be compensatory, leading to a windfall for the claimants, or would necessitate a "post-trial process whereby EEOC would be allowed to identify additional class members to share in any recovery." (Pl. Br. 27 n.5). Both scenarios are unpalatable, and the latter scenario is sketched out in such minimal detail that the fraught logistics barely emerge. For example, it is entirely unclear to the Court whether and how Defendants would be permitted to rebut the inference of discrimination and challenge the individualized relief for each new claimant that emerges post-trial. Yet, under the *Teamsters* framework, they surely have that right.

The proposed "punitive" damages to be awarded as a result of such an adverse inference instruction under the EEOC's proposal fare no better: at the time of the award, such damages would be entirely untethered to the harm

52

suffered by any individual and would be presumptively unreasonable.  *See Johnson* v. *Nextel Commc'ns Inc.*, 780 F.3d 128, 148 (2d Cir. 2015) ("[P]unitive damages awards must be tethered to compensatory damages in order to comply with due process[.]"); *In re Simon II Litig.*, 407 F.3d 125, 139 (2d Cir. 2005) (noting that "[h]armful behavior that is not 'correlatable' with class members and the harm or potential harm to them [is] precluded" from the punitive damages calculus).

The motion for summary judgment on the record-keeping violation, and the concomitant request for a finding of spoliation, must be denied.

### 4.    The EEOC's Motion for Bifurcation of the Trial Is Granted in Part and Denied in Part

Finally, as the Court has denied the EEOC's motion for summary judgment, the Court must determine whether and how to bifurcate the trial in this action.[18]  Specifically, if the trial is to be bifurcated, the Court must decide whether punitive damages will be addressed during Phase I or Phase II.

Under Title VII, a jury may award punitive damages if it finds that the employer "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.C. § 1981a(b)(1).  For an employer of Mavis's size, "[t]he sum of the amount of compensatory damages … and the amount of

---

[18]    According to the EEOC, "th[e] motion regarding a bifurcated proceeding and punitive damages would [have] become moot if the EEOC's summary judgment motion on pattern-or-practice liability [were] granted."  (Pl. Br. 29 n.6).

punitive damages awarded … [can]not exceed, for each complaining party … $300,000." *Id.* § 1981a(b)(3)(D).

The EEOC argues that, "[b]ecause of the overlap in the evidence to be presented to establish liability based on a pattern or practice of discrimination and to determine class-wide punitive damages, the issue of punitive damages should be addressed during [Phase] I." (Pl. Br. 29).  Defendants counter that "punitive damages — like compensatory damages — are an individual, not a class-wide remedy" and thus should be reserved for Phase II.  (Def. Opp. 9).  Moreover, Defendants argue that awarding punitive damages before compensatory damages are determined is bound to run afoul of the rule that punitive damages awarded must be "reasonable and proportionate to the amount of harm to the [claimant] and to the general damages recovered."  (Def. Opp. 10 (quoting *State Farm Mut. Auto. Ins. Co.* v. *Campbell*, 538 U.S. 408, 426 (2003))).  The EEOC responds to this argument by noting that the statutory caps provided by Title VII preclude an unreasonable punitive damages award. (*See* Pl. Br. 32-33).  Having considered the parties' arguments on this issue, the Court agrees with Defendants that the issue of punitive damages should be decided during Phase II.

Taking the easiest (inasmuch as it is uncontested) part of this motion first, the Court finds that bifurcation of the liability and remedial portions of the trial is appropriate.  Although *Teamsters* does not explicitly require a bifurcation of trials into two phases, it certainly suggests this approach. *Teamsters*, 431 U.S. at 361 ("[A] district court must usually conduct additional

proceedings after the liability phase of the trial to determine the scope of individual relief."); *see also Wal-Mart*, 131 S. Ct. at 2561 ("[The] procedure for trying pattern-or-practice cases that gives effect to these statutory requirements" includes a second "phase, [in which the burden of proof … shift[s] to the company"); *Brown* v. *Nucor Corp.*, 576 F.3d 149, 159 (4th Cir. 2009) ("Bifurcation of Title VII class action proceedings for hearings on liability and damages is now commonplace." (citation omitted)); *Robinson*, 267 F.3d at 168 ("[L]itigating the pattern-or-practice liability phase [first] reduce[s] the range of issues in dispute and promote[s] judicial economy.").  Accordingly, Phase I of the trial in this action will concern liability, and Phase II will concern individual relief.

Turning to the issue of when to address punitive damages, the Court is mindful that "there are procedural and substantive constitutional limitations on [punitive damages] awards," and that "[t]he Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary" awards.  *State Farm*, 538 U.S. at 416.  Moreover, "courts must ensure that the measure of [punitive damages] is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered."  *Id.* at 420.  However, "[c]ourts are divided … on whether … the issue of punitive damages, can be determined on a class-wide basis in the first phase" of a bifurcated pattern-or-practice trial.  *PMT Corp.*, 2015 WL 5026029, at *4 (collecting cases).  On this issue, the Court finds instructive the Second Circuit's treatment of class-wide punitive damages

awards outside the context of pattern-or-practice claims, specifically in *In re Simon II Litigation*, 407 F.3d 125 (2d Cir. 2005), and in *Johnson* v. *Nextel Communications Inc.*, 780 F.3d 128 (2d Cir. 2015).

In *Simon II*, the Second Circuit expressed concern with the district court's class certification order, which sought "an assessment of punitive damages prior to an actual determination and award of compensatory damages." 407 F.3d at 138. The Court's concern, animated by the Supreme Court's decision in *State Farm*, was that the anticipated trial plan "would fail to ensure that a jury will be able to assess an award that, in the first instance, will bear a sufficient nexus to the actual and potential harm to the plaintiff class, and that will be reasonable and proportionate to those harms." *Id.* As the Second Circuit admonished, in assessing punitive damages, the "conduct relevant to the reprehensibility analysis must have a nexus to the specific harm suffered by the plaintiff, and [can]not be independent of or dissimilar to the conduct that harms the plaintiff." *Id.* at 139 (citing *State Farm*, 538 U.S. at 422-23)).

In *Johnson*, the Second Circuit addressed the prudence of having a punitive damages "ratio" established in an early phase of trial, which would then be applied in a subsequent phase. Because the Court vacated the district court's certification of the class, it did "not decide the constitutional question whether such a punitive damages ratio [would be] inconsistent with due process." 780 F.3d at 148-49. However, precisely because the Circuit

"remand[ed] the case for further proceedings," it also "tarr[ied] to express

concern about the district court's adoption of [the] trial plan." *Id.* at 148.

The trial plan in that case was somewhat more complicated than the

plan proposed by the EEOC here.  Specifically, it called for three phases:

> In Phase I, a jury would decide the common liability
> issues.  In Phase II, the same jury would determine the
> compensatory damages for the named plaintiffs.  The
> jury would then determine if the class was entitled to
> punitive damages, and, if so, it would determine a
> punitive-to-compensatory damages "ratio" based on
> defendants' conduct toward the entire class.  Finally, in
> Phase III, different juries would conduct abbreviated
> individualized damages trials for the class members, in
> which individualized defenses would be considered.
> After the Phase III jury determined the amount of
> compensatory damages for each individual class
> member, the court would apply the punitive-to-
> compensatory damages ratio set by the Phase II jury
> and award the resulting punitive damages, if any, while
> retaining the discretion to make an independent
> assessment of whether the total award was
> inappropriate for any particular class member.

*Johnson*, 780 F.3d at 136.  In offering guidance to the district court on remand,

the Second Circuit expressed concern that the "Phase II jury would lack any

conception of the actual damages to the members of the class to whom the

ratio would subsequently be applied." *Id.* at 149.  This proposed "one-size-fits-

all punitive damages ratio," the Court explained, "would be no more tethered to

compensatory damages than the lump sum [of punitive damages] disapproved

of in *Simon II.*" *Id.*

Here, by contrast, the EEOC has suggested "an aggregate [punitive

damages] award that ... would [be] distribute[d] to those in the class who are

entitled to relief on a pro rata basis." (Nov. 25 Tr. 8).  In other words, as in

*Simon II*, a lump-sum punitive damages award would be decided "prior to an actual determination and award of compensatory damages."  407 F.3d at 138. This proposal, however, engenders the same concerns articulated in *Simon II* and *Johnson*.  The EEOC's proposed Phase I jury would be wholly ignorant as to the actual damages suffered by any of the individual claimants, a scenario that the Second Circuit has disfavored.  *See Simon II*, 407 F.3d at 139 (rejecting lump-sum punitive damages award because the "conduct relevant to the reprehensibility analysis must have a nexus to the specific harm suffered by the plaintiff, and … it [can]not be independent of or dissimilar to the conduct that harms the plaintiff").  Accordingly, the Court is persuaded that the prudent course is to address the issue of punitive damages during Phase II. *See David* v. *Signal Int'l, LLC*, 37 F. Supp. 3d 814, 821-22 (E.D. La. 2013) ("After a jury determines whether Signal engaged in a pattern or practice of discrimination in Phase I, Phase II will address issues concerning each individual employees' claim for relief, including … compensatory and punitive damages.").[19]

Even accepting the EEOC's argument that the $300,000 cap in damages prevents any individual claimant's punitive damages award from being

---

[19]    The Court also notes that, although *Johnson* did not involve a pattern-or-practice claim, the Second Circuit cited the Fifth Circuit's decision in *Allison* v. *Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1998), which held, in a pattern-or-practice case, that "punitive damages must be determined after proof of liability to individual plaintiffs at the second stage …, not upon the mere finding of general liability to the class at the first stage." *Johnson* v. *Nextel Commc'ns Inc.*, 780 F.3d 128, 149 n.26 (2d Cir. 2015) (quoting *Allison*, 151 F.3d at 418).  Coupled with its aversion in *Johnson* and *Simon II* to classwide punitive damages awards, the Second Circuit's tacit approval of *Allison* provides added comfort to the Court that punitive damages should be determined during Phase II of a pattern-or-practice trial.

constitutionally offensive, the Court disagrees with the foundational premise of the EEOC's argument for Phase I determination of punitive damages. That is, the EEOC presumes, as do Defendants, that there will be two juries. But the EEOC's entire argument as to why punitive damages should be tried during Phase I falls apart if the very same jury hears Phase II. (*See* Pl. Opp. 30 (arguing that "the jury hearing the evidence and making the finding on systemic discrimination" should decide the "entitlement to punitive damages")). *See EEOC* v. *New Indianapolis Hotels, LLC*, No. 10 Civ. 1234 (WTL) (DKL), 2012 WL 364052, at *2 (S.D. Ind. Feb. 1, 2012) ("The Court notes that the use of one jury also addresses the EEOC's arguments for determining punitive damages in phase one. The EEOC correctly points out that, if there are two juries, deciding punitive damages in the second phase would be unduly wasteful: the parties would have to represent evidence presented at the liability phase again in order to assist the trier in making its punitive damages determination. Yet if there is one jury, the parties need not revisit the evidence produced in the first phase.").

Although the Court teed this issue up during the pre-motion conference, explaining to the EEOC that the "argument about judicial economy works better if there is, in fact, an entirely separate jury … impaneled for purposes of [Phase] II" (Nov. 25 Tr. 5), neither party has provided a satisfactory explanation as to why two juries would be necessary for this case. As the EEOC conceded during the pre-motion conference, while "[t]here usually is a gap [between phases in pattern-or-practice cases], … that doesn't preclude the Court from

proceeding" directly into Phase II after a Phase I liability verdict in favor of the EEOC. (*Id.* at 4). For their part, Defendants simply argued that there should "be a separate proceeding" because, after Phase I, "you then have a finding, [and] there then is ... preparation" required "to show in each of th[e] [claimant's] cases that there were reasons other than this pattern or practice against hiring women that resulted in their nonhiring." (*Id.* at 13-14).

However, despite the interest the Court expressed on this topic during the pre-motion conference, the parties have not cited cases or pointed to specific, practical reasons that explain why this particular action must be tried to two separate juries. (*Cf.* Nov. 25 Tr. 13 ("In some ... cases, your Honor, there are things that are done in between [Phase I and Phase II]. There are some things that weren't done here[.]")). Unlike pattern-or-practice cases that proceed under a bifurcated discovery plan, with a pattern-or-practice liability trial coming at the close of liability discovery and before discovery regarding individualized relief, discovery in this action is closed. That is, costs associated with Phase II discovery are sunk, and witnesses have already been inconvenienced and deposed. Similarly, in some cases the number of claimants or class members is so large as to necessitate two (or more) separate proceedings. *See, e.g.*, *Robinson*, 267 F.3d at 169 n.13 ("[G]iven the [1,300] members in the putative class, the district court is likely to try the remedial phase of each class member's claim before a separate jury from the one that considers the liability phase[.]"). Not so here, where there is a relatively modest

number of claimants.  (*See* Pl. Opp. 27 n.5 (noting that there are "15 testifying class members")).

It is decidedly not the Court's place to conjure up reasons why two juries need to hear this case.  It is enough for now to say that the case will be tried in two phases.  *See New Indianapolis Hotels*, 2012 WL 364052, at *2 ("[T]rial of the EEOC's claims will proceed before one jury with a liability phase and if necessary, a second, damages phase following immediately on the heels of the first phase."); *Rosen* v. *Reckitt & Colman, Inc.*, No. 91 Civ. 1675 (LMM), 1994 WL 652534, at *5 (S.D.N.Y. Nov. 17, 1994) ("If by bifurcation the Plaintiff means separate trials, with distinct juries, the Court would not expect significant economies of scale .... The Court will instead conduct a single trial, in two stages, which addresses Plaintiffs' fear of repetitively presenting their pattern and practice evidence, and Defendants' concern of an unfair presumption resulting from evidence that a second jury has not had an opportunity to hear.").  Although the Court will not foreclose the parties from moving *in limine* to have Phase I and Phase II tried to two separate juries, the Court will not endorse such a bifurcation absent good reason.  *See State Farm*, 538 U.S. at 416 (noting that "compensatory and punitive damages ... [are] usually awarded at the same time by the same decisionmaker").[20]

---

[20]   Because the Court is of the mind that this case can be tried to a single jury, it does not reach the EEOC's alternative argument that a Phase I jury should decide *entitlement* to punitive damages, while a Phase II jury decides the *amount* of punitive damages.  (*See* Pl. Br. 31 n.7 (citing, *inter alia*, *Pitre*, 908 F. Supp. 2d at 1178)).  The Court notes, however, that the approach to bifurcation adopted in *Pitre* has not been universally accepted.  *See, e.g.*, *EEOC* v. *Performance Food Grp., Inc.*, 16 F. Supp. 3d 576, 583 (D. Md. 2014) ("A *Pitre* Phase II jury bound by a *Pitre* Phase I jury's determination that [the employer] acted with malice or reckless indifference in regard to the individual that the

## CONCLUSION

For the foregoing reasons, the EEOC's motion for summary judgment on its pattern-or-practice claim and its record-keeping claim is DENIED.  The EEOC's motion for a bifurcated trial is GRANTED IN PART and DENIED IN PART.  Trial shall proceed in two phases, with punitive damages to be awarded (if at all) during the second phase.

The parties shall appear for a pretrial conference on **October 2, 2015, at 11:00 a.m.** in Courtroom 618 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York.  By Thursday of the week prior to that conference, the parties shall file a joint letter, not to exceed three pages, raising any issues the parties would like to address at the pretrial conference and providing any information that the parties believe may assist the Court in advancing the case to settlement or trial.

---

*Pitre* Phase II jury was considering would not be basing its exercise of discretion upon its own finding of malice or reckless indifference.  Nor would the *Pitre* Phase II jury be able to consider, in regard to its discretionary decision, the degree of malice or reckless indifference pertinent to the individual issue.  Hence, there would, inevitably, be a serious issue whether, under the *Pitre* procedure, [the employer] would be deprived of its Seventh Amendment right to trial by jury."); *see generally Johnson*, 780 F.3d at 150 n.27 ("To the extent the trial plan here contemplates that the Phase III jury (or juries) or the district court would have to reassess the reprehensibility of Nextel's conduct in order to determine the appropriateness of a punitive damages award, such a plan could run afoul of the Seventh Amendment.").  *But see EEOC* v. *Cintas Corp.*, No. 04 Civ. 40132 (SFC), 2015 WL 1954476, at *6 (E.D. Mich. Apr. 29, 2015) ("[W]hile the availability of punitive damages shall be adjudicated at the Phase I Trial, any determination of the aggregate amount and individual distribution of punitive damages shall be reserved for the Phase II Trial."); *Ellis* v. *Costco Wholesale Corp.*, 285 F.R.D. 492, 543 (N.D. Cal. 2012) ("[T]rying these potentially overlapping issues of liability and entitlement to punitive damages before a single jury ensures compliance with the Seventh Amendment's prohibition on reexamination.  Conversely, separating all classwide liability determinations (of liability and availability of punitive damages) from any quantification of damages would preserve separate questions for separate fact finders and is thus consistent with the Seventh Amendment." (collecting cases)).

SO ORDERED.

Dated:     September 11, 2015
              New York, New York

                                             KATHERINE POLK FAILLA
                                      United States District Judge